### PATRICK CONVERY v. JOHN H. CONGER.

1. When documents or instruments, which are legitimate evidence of fact, are produced by one of the parties at a trial, and submitted to the examination of the jury or judge sitting instead of a jury, and witnesses testify with regard to them whose testimony would be unintelligible without such documents or instruments, the documents or instruments are thereby made evidence in the cause on the side of the party producing them, without a more formal offer, and it is not an error, of which the opposite party can complain, if the trial judge so rules.

2. A witness testified that he had repaired and adjusted several hundred of the Hall & Wood ballot box machines, and was familiar with the marks which machines of that pattern would impress upon ballots going through them. *Held*, that his opinion, whether the marks upon

the ballots lying before him were such as a machine of that pattern, which was also before him, might make, was legal evidence.

On appeal from the judgment of the Circuit Court of Middlesex county in a case of contested election.

Argued at November Term, 1890, before BEASLEY, CHIEF JUSTICE, and Justices MAGIE and DIXON.

For the appellant, *Robert Adrain* and *Allan L. McDermott.*

For the contestant, *Alan H. Strong* and *Abraham V. Schenck.*

The opinion of the court was delivered by

DIXON, J. This is an appeal, under section 113 of "An act to regulate elections" (*Rev., p.* 337), from the decision of the Middlesex County Circuit Court, upon a contest arising over the election of county clerk in November, 1889. The county canvassers had determined that at the election Patrick Convery received five thousand nine hundred and forty-nine votes and John H. Conger five thousand nine hundred and thirty-three votes for the office of county clerk, thus electing the former by a plurality of sixteen. In this canvass, out of six hundred and eight votes cast in the First polling precinct of the Sixth ward of New Brunswick five hundred and five votes were counted for Convery and one hundred for Conger. Before the Circuit Court, Conger insisted that in that polling place he had received over two hundred legal votes, and that some of them had been fraudulently abstracted and ballots for his opponent fraudulently substituted, so that, according to the votes actually cast, he, Conger, was elected. The Circuit Court decided in his favor, and ordered that he be put into possession of the office. Thereupon Convery appealed under the statute to the Supreme Court, alleging in his petition seven grounds of error in law committed at the Circuit.

Of these, the sixth and seventh have already been adjudicated by this court in *Conger* v. *Convery,* 20 *Atl. Rep.* 166;

the first and second were not referred to by appellant's counsel on the argument, and are presumably abandoned; so that there remain to be now considered only the third, fourth and fifth.

The last two grounds of error relate to the action of the Circuit with regard to the ballot box and ballots canvassed in the disputed precinct. The appellant contends that they were not put in evidence at the trial, and therefore the Circuit Court should not have considered them and should have struck out all oral testimony concerning them.

The trial was brought on before Mr. Justice Scudder without a jury, and, according to the bills of exceptions, this was the action taken: The counsel for contestant produced before the justice the box containing the ballots, which was then opened, and the justice inspected its mechanism and contents; each ballot was then examined by counsel on both sides, and a memorandum made of the name upon it for county clerk; then contestant's counsel desiring to call voters as witnesses to prove how they had voted, the counsel for the appellant inquired whether the box and contents were offered in evidence, to which the justice replied, "They have not been yet, but I suppose they will be eventually; undoubtedly either side may offer them;" and contestant's counsel said, "We have not offered them yet, but undoubtedly we will offer them;" the appellant's counsel then objected to the examination of voters, urging that the ballots were the best evidence, and that the appellant relied upon them.; after the testimony of the voters had been heard, the ballots were inspected singly by the justice, and a witness produced by the contestant was examined with regard to the indications upon each of its having passed through the mechanism of the box. Subsequently the following took place (page 143 of the printed book):

"Contestant's counsel—I offer now in evidence the poll book * * * and register.

"Appellant's counsel—You don't offer the box or ballots?'

"Contestant's counsel—No, sir.

"Appellant's counsel—I move, may it please the court, that all the testimony concerning the ballot box, its condition as it appears now in court, and the ballots and their condition, be stricken out, on the ground that they can be relevant only in this case if the box and ballots are offered as exhibits by the parties offering the evidence.

" The Court—I suppose, in effect, the motion is a motion of non-suit. The plaintiffs have not produced the ballots and ballot box, or at least the instruments offered—have not produced them in evidence upon their side, and if they have not they are not in evidence, and they stand upon the testimony as to other facts in the case outside. I will overrule the motion, and give you an exception. It will have to be tried, of course, as the counsel see fit to present it.

" Exception allowed and sealed.

" E. W. SCUDDER. [L. S.]

" Contestant's counsel—My opinion about this box and its contents is, that they shall be offered as exhibits for identification not properly in evidence, but what the court has inspected, and what may possibly be referred to hereafter; and I therefore ask in that sense that they be marked for identification.

" The Court—I consider them so. They are marked for identification."

Thereupon the contestant rested, and the appellant produced testimony and rested; and then ensued the following (page 204 of the printed book):

" The Court—I would say that both parties have rested without putting in evidence the ballot box, its contents and the tickets. I certainly shall not decide this case without those things being offered in evidence, and I consider them in evidence. They were called for by counsel for the contestant, admitted by the court against the objection of the incumbent's counsel, examined thoroughly and cross-examined

upon, and they are in evidence in this cause. I shall so consider them, both sides having rested their case.

"Appellant's counsel—May we ask on whose side they are in?

"The Court—The party who called for them orignally; the contestant called for them and you cross-examined upon them; I consider them in evidence on the part of the side calling for them.

"Appellant's counsel—To that ruling of the court we pray an exception.

"Exception allowed and sealed.

"E. W. SCUDDER. [L. S.]

"The Court—Either side may take an exception if they desire; I simply say I will not decide the case without those before me.

"Appellant's counsel—An exhibit having been testified to by the contestant, by his witnesses, and he having declined to pursue that exhibit further than to identify it by certain marks upon it, or the absence of certain marks, it is accepted by the court as an exhibit on their part.

"The Court—It is in evidence for what it is worth.

"Contestant's counsel—I suppose the court, of its own motion, can put them in evidence.

"The Court—That is what I do, upon my own motion. I say the party who called for them must consider them in evidence on their side, and the court will not decide the case without their being in evidence.

"Contestant's counsel—I do not see how the court could fairly decide this cause without them. I suppose the offer is a mere technical matter."

Upon this state of the case, the appellant claims, not that the box and ballots were legally inadmissible as evidence, but that, in fact, they were not put in evidence.

I think the record plainly manifests that they were put in evidence. When they were produced to and inspected by the justice as facts to be considered by him, and witnesses were

examined whose testimony was unintelligible unless they were so considered, they were necessarily made evidence. As well might a party say that the testimony of a witness, whom he has called and sworn and examined, is not in evidence, as to say that a document, which he has proved and submitted as a fact to those who are to pass upon the facts, is not in evidence. His conduct has put it in evidence, and, if he repents, he can only seek permission to withdraw it.

I also think the record shows that the contestant formally offered the box and ballots in evidence. His counsel apparently feared (without the slightest legal reason) the effect of a formal offer, as evidence, of ballots which they deemed fraudulent, and so, at the close of their testimony, guardedly offered the box and ballots *as exhibits*, using the word which the appellant's counsel had employed to indicate what they insisted on, and subsequently the contestant's counsel declared their acquiescence in the determination of the court to treat the box and ballots as evidence offered by the contestant. This amounted, in form as well as in substance, to an offer of these articles in evidence by the contestant.

I find no error on this point.

The other assignment of error is, that " the court erred in permitting the testimony of Louis Weil as an expert upon the subject of whether each ticket in the Hall & Wood ballot box had actually passed the slot, as it was a matter of observation."

This does not precisely state the purpose for which the testimony of the expert was offered and received. The exact purpose was that he might " take up each ballot by itself and express his opinion as to whether he sees upon that ballot the indication of passing through the machine." This he did, the justice examining each ballot with him.

We are to consider whether his opinion upon that matter was competent.

Said Chief Justice Green, delivering the judgment of the Court of Errors in *Cook* v. *The State*, 4 *Zab.* 843, 852 : " The line between questions of science or professional skill, to which

an expert may legally testify, and questions of mere judgment, which the jury alone are to answer upon. the facts proved, is not always susceptible of being clearly defined. The distinction stated by Mr. Smith, in his notes to *Carter* v. *Boehm* (1 *Sm. Lead. Cas.* 206), is, perhaps, as satisfactory a statement of the rule as can be made: ' The opinion of witnesses possessing peculiar skill is admissible whenever the subject matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance, in other words, when it so far partakes of the nature of a science as to require a course of previous habit or study in order to the attainment of a knowledge of it; but the opinion of witnesses cannot be received, when the inquiry is into a subject matter, the nature of which is not such as to require any peculiar habits or study, in order to qualify a man to understand it.' "

Perhaps not strictly within the principle thus enunciated, but certainly akin to it, is the rule admitting the opinion of witnesses with regard to the genuineness of handwriting, of coins, of paper money, of pictures, of postmarks, of corporate and official seals, and of other such matters, to which the witness may speak, not so much because of any special skill, but because from previous acquaintance with genuine specimens, or with the instrument for making them, he can recall a mental image of their peculiarities with which to compare the thing produced, and so form an opinion as to its authenticity.

Of this class was the evidence now under consideration. The witness had repaired and adjusted several hundred machines of the same pattern as that used in the disputed election, and so had become familiar with the effects it would produce upon ballots passing through it. From this experience he was enabled to testify that, if in perfect order, the machine would imprint upon each ballot a small circle and the name of the election district, in ink, and would, also, at the centre of the circle, indent or puncture all or some of the folds of the ballot, and would impress on each side of the ballot, as folded, a series of linear indentations resembling the

milled edge of a coin. He also testified that the machine then before him was not in order; that it would not print the circle and name, and might not produce the puncture or indentation through the folds, and that the position and distinctness of the puncture and indentations would vary with the different strength and thickness of the ballots and the direction of their passage through the machine. So much was stated verbally by the witness, but even this was not enough to qualify one for determining whether the marks, to be observed upon each ballot, were made by the machine. A more exact idea of its effects than words could convey was necessary for that purpose. The peculiar experience of the witness had left in his mind standards, or elements for the formation of standards, with which the impressions upon each ballot could be compared, as the basis of an opinion useful in deciding the question before the court, but it was as impracticable for him to state to the justice in advance the grounds upon which his opinion in each instance would rest, as it would be for a witness testifying about the genuineness of handwriting. Probably, by a careful examination of the machine, or of many ballots stamped by it, the justice would become competent to form an opinion for himself as to other ballots, but that ability on his part would no more render the opinion of the witness illegal as evidence than would similar conditions touching a corporate seal. The opinion of witnesses in such cases is not, in a technical sense, secondary evidence, to be received only when weightier evidence cannot be secured. It is legally admissible before the jury, although every juryman on the panel had previously acquired, or from other evidence in the cause could acquire, the ability to form as trustworthy an opinion as that of the witness. In the present case, the justice clearly recognized the aid which the opinion of the witness might afford him in his own investigation of the facts, and therefore the doctrine of the Supreme Court of Massachusetts, expressed in *Bacon* v. *Williams*, 13 *Gray* 525, is especially pertinent, that "the capacity of a witness to enlighten a jury on a matter of skill

or science, or on a subject beyond the common experience of men, can be best estimated by the judge who presides at the trial; and this court would be slow to revise a ruling on such a question, unless the error was very plain and palpable."

The Circuit Court was not in error upon this point.

The judgment below should be affirmed.

BEASLEY, CHIEF JUSTICE (dissenting). As I have found it impossible to agree to the conclusion reached by my brethren in this case, it seems incumbent upon me to assign my reasons for such dissent.

My preventives from concurrence are two in number, the first of these being the admission at the trial of a witness as an expert who, in my estimation, was plainly not such.

This question was presented in the course of certain proceedings, before the Circuit Court of the County of Middlesex, in which the election of the clerk of that county was in contest. This examination had been instituted by virtue of division nine of the "Act to regulate elections" (*Rev.*, *p.* 358), and it was made before the judge of the Circuit sitting judicially and as a jury. In the course of the trial the ballot box that had been used at the election in question was produced in court, and was there opened and the ballots which it contained were disclosed. This box was furnished with the well-known apparatus designed to mark the ballots as they are deposited in the box. Pieces of paper folded so as to represent ballots were, at the trial, passed through this apparatus and exhibited to the court in order to show the marks thus impressed upon them. The apparatus itself was then opened, exhibited and its movements explained.

When in complete order, this machine was intended to mark the ballots with three devices, namely: *First*. With certain printed letters in ink. *Second*. With a mark made by a needle point. *Third*. With a slight milling on the edge of the tickets. The milling here mentioned was occasioned by the ballots being pressed, in their passage into the box, against the surface of a roller whose sides were slightly ser-

rated; that is, indented somewhat like the edges of a coin. In the present instance we have no concern with the first of the above-mentioned indications, for at this election the printing mechanism was out of order, so that none of the tickets had any trace of ink marks upon them.

After the machine had been exhibited and its movements explained, the claimant introduced one Louis Weil as a witness. This man had formerly been employed in repairing these machines just referred to. He it was who exhibited the machine in question to the court and fully explained its design and the mode of its operation. He pointed out to the court the indented edges of the instrument that were calculated to mill the ballots and also the needle that punctured them. In short, the operating of the machine with respect to tickets subjected to it in any way was fully explained.

To this extent the testimony was plainly proper, and no question was raised with respect to its legality.

The next step in the proceeding was the examination of the ballots as they were taken from the box. Many of these were plainly milled and plainly punctured; upon most, however, such marks were exceedingly indistinct. Some of the tickets were only milled and others only punctured with more or less conspicuousness.

These tickets in this condition were taken *seriatim* from the box, and the witness was, as an expert, permitted to express his opinion whether each had or had not been subjected to the apparatus already described.

In this judicial action I think there was plain error in law; the witness was not, in my opinion, an expert over the subject in question.

That question was purely this, whether, from the indications upon the ballots, the witness could say whether or not such ballots had been acted upon by the marking apparatus before the court. With respect to that matter, the witness had no special knowledge whatever. Being provided with eyes, he could see whether the ballots looked as though they were milled or were punctured, and so could any other person

with similar natural qualifications. But how could this man, by reason of superior acquirement, say that such milling or punching had been done by this machine? Any person seeing such notations would, under the circumstances, have been strongly inclined to draw the inference that such had been the case, but how was this man entitled to draw such inference and give his opinion on the subject *ex cathedra?* The exact posture may be elucidated by an example taken from the testimony. On page 75 of the book this narration occurs:

"*Q.* Is there any evidence that that ticket touched the machine?

"*A.* No, sir; there is no evidence of that.

"*Q.* Then, in your opinion, a ticket can go through the box without touching the machine?

"*A.* The impression can be called out, I think, by a glass, but not by the naked eye.

"*Q.* Would you like to have a glass?

"*A.* Yes, I would like to have a glass.

"*Q.* There is a better light here?

"*A.* There is light enough here; I will now call that ticket milled and not punched.

"*Q.* A moment ago it was punched and not milled?

"*A.* I can see the punch and not the milling, but now I can prove the milling, to the court, of this ticket. [Witness uses glass.]

" The Court [then says]—Yes, there is some fine impression there that may be milling. [The Court uses the glass also.] There seems to be some indented marks on the ridge, but they seem to be fine. The witness can state his judgment, too.

" The witness—I think it is milled and not punched."

The witness then proceeded to select in that way such ballots as, in his opinion, had passed through the aperture, and with respect to the residue he expressed his opinion, " that they were put in the box without the use of the machine."

It will be observed that in the instance just displayed the

witness expressed his opinion on two points: *First,* that there were marks on the ballot observable through the glass; and, *second,* that such marks were millings, and millings by the machine in question.

Therefore, the question arises, what qualifications had this witness superior to those of the judge, or those of ordinary persons that legalize his opinion on either of these points? Was there a mark on the ticket? If so, did it denote indentation of the ticket made by the machine? were, as I think, very plainly, matters for the determination of uninstructed eyesight and inference. In this respect, one man's opinion is worth as much as that of another, and it does not seem to me that any series of experiments or practice of observation would have bestowed in the least degree any pre-eminence of knowledge. Whether a paper is indented on its face or edges; whether a small puncture, such as can be made by a large needle, or by any similar instrument, had been made by this apparatus, or by some other means, was a problem that addressed itself exclusively to the senses and judgments of the ordinary man and in no degree to the trained eye of the expert. But even if this were not so, still the witness had not the right to express his opinion in the matter, for it seems plain that he was not an expert with regard to it. An expert is defined to be a person who has made the subject upon which he gives his opinion a matter of particular study, practice or observation. And he must have a particular and special knowledge on the subject. It has appeared that the question in this case was, whether the character impressed upon the tickets had been made by this machine, so that the witness, in effect, was asked whether he had practical acquaintance with such impressions so that he could identify them. The inquiry was identical with that which arises with respect to the authenticity of handwriting—is the given writing that of "A." A person who had from previous practice and observation, and who thereby had acquired a knowledge of the peculiarity of "A's" hand, may, in a court of justice, express an opinion touching the specimen to which his attention

is directed. So, here, let it be admitted, for the purpose of the argument, that these impressions could be the subject of recognition the question is then presented, what did this witness know about them? The answer is, that in this particular he had no knowledge whatever; so far from having made these impressions a " matter of particular study, practice or observation," it must be certainly presumed that before the hour of his examination in court he had never seen a. *single specimen of them.* I say, this must be the unquestionable presumption, because the record fails to show that the witness had any previous experience with regard to these marks upon ballots, and it was incumbent on the claimant to prove that his witness had the acquirements of an expert; the rule applies in its fullest force *quod non apparet non est.* All that we know touching the qualifications of this witness is, that from time to time he had mended these machines when they were out of order; the posture of things was therefore this : both the witness and the judge knew that the apparatus in question would generally mill and puncture tickets as they passed into the box, in manner generally similar to that exhibited by the tickets scrutinized by them, but that this witness was an expert, and therefore empowered in law to express his opinion that the marks on the tickets had been marked by such apparatus, on the ground that he had frequently repaired machinery of that kind, seems to me a proposition plainly false. The judge could tell as well as the witness, from the marks on the tickets under inspection, whether they had been subjected to this marking machine, and he did not require, nor did the law permit him, to have the views of any one having no pre-eminent knowledge. The consequence is, that when the witness was permitted to scrutinize those ballots with a glass and to express his opinion that there were marks upon them, and that although very faint they were millings made by this machine, in my judgment, there was plain error in law, inasmuch as the witness, as far as we know, had never before used a glass and had

never seen an instance of indentation made by this or any similar instrument.

The rule on this subject, adopted by the Court of Errors in the case of *Cook* v. *State*, 4 *Zab.* 852, is expressed in these terms: " The opinion of witnesses cannot be received when the inquiry is into a subject matter, the nature of which is not such as to require any particular habits or study, in order to qualify a man to understand it."

That rule was utterly disregarded when this witness was permitted, as in the instance already particularly stated, to look through a glass and express the opinion that there were faint traces on the ballot being criticised, and that such marks were milling made by the machine in question, for the reason that the witness had no experience whatever or especial knowledge on the subject, and that it was a matter that rested entirely in common observation and common inference.

Entertaining this view, the question seems to me to be whether this judgment or this legal rule shall be set aside, and this is the reason why I cannot concur in the opinion of my brethren.

In the second place, this trial was illegalized by another incident, the facts involving it being these:

The contestant, occupying the position of plaintiff in order to sustain his contention that a majority of votes had been cast for him at the election, introduced as witnesses a large number of voters whose testimony was favorable to him. That testimony, when compared with the election return, tended to show that he was entitled to the office in question. As supplementary to this line of evidence, he caused to be brought into court the ballot box and its contents, and his counsel was asked by the opposing counsel if this box and the ballots in it were offered in evidence, and the reply was, " We have not offered them yet, but undoubtedly we will offer them."

The ballots were then examined, and witnesses interrogated as to the marks upon them. There was also evidence tending to show that on the day of the election the ballot box was for

a time under what was alleged to be suspicious circumstances, in the exclusive custody of the election officers belonging to to the political party of which the incumbent was a member.

This was the situation when the case on the part of the claimant was rested, and his counsel was again asked if he offered the box or ballots, and his answer was, " No, sir."

This is what further occurred (case, page 143): " I move [said the counsel of the incumbent], may it please the court, that all the testimony concerning the ballot box, its condition as it now appears in court, and the ballots and their condition, be stricken out, on the ground that they can be relevant only in this case if the box and ballots are offered as exhibits by the parties offering the evidence."

The reply of the court was in these words: " I suppose, in effect, the motion is a motion of non-suit. The plaintiffs have not produced the ballots and ballot box, or at least the instruments offered—have not produced them in evidence upon their side, and if they have not, they are not in evidence, and they stand upon the testimony as to the other facts outside. I will overrule the motion, and give you an exception. It will have to be tried, of course, as the counsel see fit to present it." Thereupon, an exception was taken and allowed.

With respect to this judicial action, it is obvious that it was entirely unexceptional. It was right in the refusal to non-suit on the ground of what is called the " facts in the case outside," such facts consisting of those deposed to by the witnesses who had voted for the contestant and the testimony relating to the custody of the ballot box on election day, and it was just as plainly right in its ruling that the ballot box and the ballots were not in evidence.

The claimant's case being thus rested, and its legal condition having been thus clearly and correctly explained, the incumbent's side of the contention was then presented.

It consisted entirely of the introduction of witnesses who testified to having voted for incumbent, and of testimony tending to explain away those circumstances that were charged were suspicious with regard to the custody of the ballot box on the

day of election. No evidence was offered which in the most distant degree required, in order to make it admissible, the presence of the box or the ballots as evidence in the case. The claimant offering nothing further, the case was then finally rested, and thereupon the court, of its own motion, ordered into the case the ballot box and its contents, the ballots, saying that he should consider them evidence on the part of the claimant. To this ruling an exception was taken.

No power is perceived upon which this judicial action is to be justified. The legal proposition that could alone sustain it would be this, that when a plaintiff rests his case the court can, in solemn form, declare that a certain line of testimony is not in such case, and that then, when the testimony shall have been closed, may by judicial edict introduce such rejected evidence against the protest of the defence.

It is safe to say that such a course is absolutely abnormal. It has no antecedent which even bears any resemblance to it. It is difficult to see how a litigation can be fairly investigated in the presence of such a rule of procedure.

When a defendant at the close of a plaintiff's case is assured by a judicial decision formally made that certain testimony is not in his adversary's case, what is he to do unless he can rely on such adjudication? How is he to construct his defence? In the present instance, when this incumbent was told that the ballots were not in evidence, is it possible to contend that he was bound to offer testimony to explain, if he could, the marks upon them, or to contradict or avoid those things that the witnesses of his opponent had deposed in relation to them? It does not seem reasonable to contend that it was incumbent on this defendant to anticipate that the court, without the minutest pertinent change of circumstances, would at the close of the testimony, and after he had built up his defence on its previous adjudication, reverse such adjudication and admit into the case this very evidence that it had before excluded. Such a method of procedure would, it seems to me, necessarily lead to inevitable injustice. If, therefore, the claimant had, after refusing to put in this testimony when he rested his case,

himself offered it in the last stage of the trial, such testimony would have been, in my judgment, inadmissible, and should have been rejected. But I also think that it was error in the court *ex mero motu* to order in this evidence at the time in question. Such a procedure is, as far as I am aware, unknown to the law. These are grounds in which the court acted at the trial in this respect, as indicated by the trial judge himself. This is his language : " I would say that both parties have rested without putting in evidence the ballot box, its contents and the tickets. I certainly shall not decide this case without these things being offered in evidence. I consider them in evidence. They were called for by the counsel of the contestant, admitted by the court against the objection of incumbent's counsel, examined thoroughly and cross-examined upon, and they are in evidence in this cause. I shall so consider them, both sides having rested their case."

But the record shows that important facts are here overlooked. The case states that when the ballot-box and ballots were called for by the counsel of the contestant, that such counsel at the same time declared that he did not offer them in evidence, and that when he rested his client's case he reiterated that declaration, and that thereupon the court itself adjudged that these instruments and exhibits were not in evidence. It is clear, therefore, that the question is presented in its unmitigated force, how is it that the court could interfere in the manner described ; each party expressly refused to offer this evidence, why should the court interfere ?

By such interference it is impossible to avoid the appearance of becoming a third party in the cause, and, what is worse, of favoring the one side or the other. If a court shall act in the introduction of testimony, then, as in almost every case, the effect of such testimony will be favorable to one of the litigants. The court must unavoidably exhibit itself as seemingly partial to one of the other parties. Such an attitude in the nature of things must be destructive of that public confidence in judicial indifference without which justice cannot be satisfactorily dispensed. In a political inquiry, such

as the present one, the effect of such judicial participation in the conduct of the trial would be disastrous in the extreme.

On both these grounds, therefore, this judgment, in my opinion, should be reversed.

It may be proper to say, in conclusion, that in the foregoing discussion it has been assumed that the proceedings in a case of this character are to be regulated by the ordinary legal rules which apply in procedure and evidence.

That this is the only view to take of this subject seems very evident, for otherwise the procedure would be unregulated in any particular whatever.